27512. ALLEN *v.* THE STATE.

DECIDED JULY 1, 1939.

*Hubert Fields Rawls,* for plaintiff in error.

MACINTYRE, J. W. F. Allen was indicted for kidnapping, under the Code, § 26-1602, which declares: "Any person who shall forcibly, maliciously, or fraudulently lead, take, or carry away, or decoy or entice away, any child under the age of 18 years from its parent or guardian, or against his will, or without his consent, shall be guilty of kidnapping." The jury returned a verdict of guilty, and the defendant excepted to the overruling of his motion for new trial.

The indictment charged that the defendant "did then and there unlawfully and with force and arms, maliciously, feloniously, and fraudulently lead, take, carry away, decoy, entice away one Elizabeth Johns, she being under eighteen years of age, from her parents, . . against their will and without their consent." Elizabeth Johns, the person alleged to have been kidnapped, testified, as a witness for the State, that she was fifteen years old at the time of the alleged kidnapping; that she went to the house of her brother in the company of her mother on the night in question, and there she saw the defendant. At first she swore that she did not know him; then, that she knew him slightly. However, she finally admitted that she had known him practically all her life; that he said he was nineteen years old; that he and she went out on the porch and talked for about an hour; that they had been seeing each other quite a bit, and she finally agreed to go with him to Folkston for the purpose of marrying him; that her mother did not know she was leaving, and did not give her consent thereto; that Lula Allen, the defendant's sister, and Melvin Crews went with them; that the four went to Folkston, and there the defendant got a license from Judge McQueen for "Elizabeth Johns and W. F. Allen;" that they went to Mr. Eddie Crews, the justice of the peace, and "he said we were married in Folkston, and all we would have to do would be to give him the papers, and W. F. gave them to him, and they went to the end of the porch and talked. Mr. Eddie Crews looked at this marriage license and said, 'It is all right. You were married in Folkston,' yes, sir." She testified, that she and the defendant went back to his father's house about daylight, his sister and Melvin Crews being with them all the time; that the defendant told his parents "I was his wife; he said we were married. . . During the week I stayed there as this boy's wife, and people coming and going, and I represented myself to be married. I considered this boy my husband. He didn't run me away from there. . . And me and this defendant both said we were married. We considered ourselves that week married, to this boy. As his wife, I lived with him that week as his wife. . . I did not get my father's and mother's consent to go." The parents of Elizabeth Johns testified that it was against their wills for her to go off with the defendant.

The questions presented in the instant case are whether or not

there was a valid marriage under the laws of this State, and, did the evidence warrant a conviction of kidnapping under the Code, § 26-1602? If a common-law marriage had been consummated, as contended by the defendant, he could not be guilty of kidnapping under said section, and it would necessarily follow that it was error to allow the witness, alleged to be the defendant's common-law wife, to testify. Under the Code, § 53-102, a female at least fourteen years of age or a male seventeen years of age, not laboring under any of the disabilities enumerated in that section, is each capable of contracting a valid marriage. Therefore if, as here, the girl is fifteen years of age, it is fair and legitimate for a man to gain her consent to marry him, if he can do so without force or fraud. "She would be incapable of consenting to go off with him to work for him, or for the purposes of prostitution, or for any other purpose except marriage alone. As to marriage, the law makes her a grown woman, and deals with her as such." "The law recognizes the validity of a marriage based upon her consent alone, even when opposed" by the parents; and the other contracting party, a boy 19 years of age, is not a felon if he, without force or fraud, enters "with her into a contract which she has . . a perfect legal right to make." *Cochran* v. *State,* 91 *Ga.* 763, 765 (18 S. E. 23). See *Handley* v. *State,* 115 *Ga.* 584 (41 S. E. 992). "When a man and woman are living together in apparent matrimony, so that they are accepted by the community as husband and wife, they are presumed, in the absence of counter presumptions or proofs, not to be violating the due order of society and breaking the law, but to be in fact married." 1 Bishop on Marriage, Divorce, and Separation, 406, § 932.

Chancellor Kent established a rule with reference to common-law marriages in this country in 1809, and in 1827 published the second of his Commentaries (2 Com. 87), in which he said: "If the contract be made *per verba de præsenti,* . . or if made *per verba de futuro,* and be followed by consummation, it amounts to a valid marriage . . and which the parties (being competent as to age and consent) can not dissolve, and it is equally binding as if made in *facie ecclesiæ.*" This language was adopted in this State in *Askew* v. *Dupree,* 30 *Ga.* 173, 178, 179, where it was said that if there was a mutual agreement between the parties to become husband and wife, and this agreement was followed by co-

habitation, the marriage would be valid and binding, provided the parties were competent, and there were no legal disabilities on the part of either to contract matrimony; and this would be true even if the parties procured no license. See, in this connection, *Allen* v. *State*, 51 *Ga. App.* 19, 22 (179 S. E. 555); *Wynne* v. *State*, 17 *Ga. App.* 263 (86 S. E. 823), and cit.; *Clark* v. *Cassidy*, 64 *Ga.* 662 (4); *Hathcock* v. *State*, 57 *Ga. App.* 334, 336 (195 S. E. 308); *Minshew* v. *State*, 25 *Ga. App.* 240 (102 S. E. 906). Evidence of mere sexual intercourse between marriageable persons, which was clandestine, or accompanied by mutual understanding that it was not marriage, or by other things or signs showing it not matrimonial, would not establish a common-law marriage. The "elements of proof in a common-law marriage—namely, cohabitation, reputation, declarations, conduct, and reception among friends and neighbors as married—are commonly, in a perfect case, found in combination. All the latter ones are shadows attending on cohabitation, and they should be simultaneous therewith. Together they make a complete case; while in legal doctrine there is no absolute necessity of exhibiting all the shadows in connection with that from which they fall, cohabitation." Bishop on Marriage, etc., 408, § 939. See *Drawdy* v. *Hesters*, 130 *Ga.* 161, 168 (60 S. E. 451, 15 L. R. A. (N. S.) 190). What W. F. Allen and Elizabeth Johns did and said amounted to a common-law marriage; that is, it was sufficient in form to be a common-law marriage, irrespective of whether they went through any directory statutory form of marriage. Then, merely because they were attempting to comply with the statutory form of marriage, and a third person, not a co-conspirator or in any way connected with either party, wilfully and knowingly represented to them that they were married or so represented in good faith, and both of them believed they were married, lived together as husband and wife, declared themselves to be such, and their conduct and reputation were such as that they were received among their friends and neighbors as married, and thereafter neither of them repudiated the marriage, did not void the marriage; and in a prosecution for kidnapping the woman was not a competent witness against the man, as she was his common-law wife.

But the State contends the marriage was void on account of fraud in its procurement, and that the alleged wife was therefore

competent to testify. "Fraud, in the constitution of the contract of marriage, renders it void. Force implies physical constraint of the will; fraud, some overruling moral necessity, by which a certain state of the will is brought about, which could not have so been without deceit. In both cases the result is the same, although the constraint employed operates differently. And as to both, morality and law visit the deed with the same condemnation." 1 Bishop, 223, § 514. But Elizabeth Johns says, "We thought we were married, and lived together publicly as man and wife," and evidently she intended and agreed to live with Allen as her husband; but she further says "We were not married." (Her testimony is in effect that she had been informed, or she had since come to the conclusion, that they were not married, because they did not follow the statutory form of marriage. This is an expression of her conclusion or the opinion of others.) But from the facts as testified to by her it affirmatively appears that such conclusions are not in accord with the truth in regard to the marriage, and such conclusions are not authorized by the facts testified to by her and others. *Chandler* v. *Southern Railway Co.*, 113 *Ga.* 130, 132 (38 S. E. 305). Here all the proof that goes to make a complete case of common-law marriage appears in the evidence; namely cohabitation, reputation, declaration, conduct, reception among friends and neighbors as married; all found in combination; and "in the absence of any positive enactment declaring that all marriages not celebrated in the forms prescribed shall be void, a marriage deliberately and intentionally entered into—*per verba de præsenti*—that is, 'I take you to be my wife,' and, 'I take you to be my husband' —by parties able to contract, is to all intents and purposes a valid marriage, notwithstanding the parties have failed to comply with the statutory provisions." *Askew* v. *Dupree*, 30 *Ga.* 173. The evidence does not disclose that Elizabeth Johns repudiated the contract of marriage immediately or a short time after she found out that they had not complied with the statutory forms. In fact, there is no evidence that she has ever repudiated the marriage. Here, notwithstanding the failure of the ordinary or the justice of the peace to perform a statutory ceremony, the parties voluntarily lived together as man and wife, she knowing and he knowing that no such statutory form had been performed. They cohabited, and she otherwise assented at least to become his common-law wife. This

assent would give validity to the common-law marriage. Bishop, § 506.; Roberts v. Cole, 12 Tex. 364; Lyndon v. Lyndon, 69 Ill. 43.

The court would recommend the statutory formalities of marriage, and that they be performed by such persons as are authorized by the statutory law of Georgia so to do, and does not commend the actions of this young couple, nor does it recommend the common-law form of marriage; it is too difficult to establish; injustices of various kinds might be done on account of the difficulties in proving such marriages, and the suspicion that more often surrounds them. A common-law wife is incompetent to testify against her common-law husband, under the Code, § 38-1604. The judge committed error in not excluding her as a witness.

*Judgment reversed. Broyles, C. J., and Guerry, J., concur.*